ROGER D. and JUDY BREDAHL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bredahl v. Commissioner
Docket No. 4678-75
United States Tax Court
T.C. Memo 1977-368; 1977 Tax Ct. Memo LEXIS 73; 36 T.C.M. (CCH) 1474; T.C.M. (RIA) 770368; October 19, 1977, Filed Daniel J. Chapman, for the petitioners. Donald W. Wolf, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, *74 Judge: This case was assigned to and heard by Special Trial Judge Charles R. Johnston pursuant to the provisions of section 7456(c) of the Internal Revenue Code and to the Order of the Chief Judge that the post-trial procedures set forth in Rule 182 of this Court's Rules of Practice and Procedure are not applicable to this case. The Court agrees with and adopts Special Trial Judge Johnston's opinion which is set forth below. OPINION OF SPECIAL TRIAL JUDGE JOHNSTON, Special Trial Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1971 in the amount of $815.50. The only issue for decision is whether payments to each petitioner by the New School of Behavioral Studies and Education at the University of North Dakota, during 1971, are excludable from gross income under section 117. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. Petitioners, Roger and Judy Bredahl, resided in Minot, North Dakota, at the time of filing their petition herein. They filed a timely Federal income tax return for the taxable year 1971 with the Internal Revenue Service Center, Fargo, North Dakota. *75 Early in their married life they undertook a program of education leading toward teaching careers. Because of their financial circumstances, both were unable to attend college at the same time. So when one did attend college, the other worked to support the household. They had two children, a daughter born in 1960, and a son born in 1962. By 1962 Roger had attained a standard degree for teaching, i.e., completion of two years of college. He taught for two years at a salary of $5,800 a year. Judy obtained a bachelor's degree about 1964 and was employed as a second grade teacher at Longfellow Elementary School in Minot. Roger then quit teaching and obtained other employment, as the manager of the appliance department for the local Montgomery Ward store. This permitted him to attend Minot State College where he ultimately received a bachelor's degree in 1969. In 1970, while Roger was enrolled as a student at the University of North Dakota, he learned of a program offered by the New School of Behavioral Studies in Education (hereinafter referred to as the New School) of the University of North Dakota leading to a master's degree in education. The program first came to his *76 attention through education journals, newspaper articles and notices sent to all teachers. Petitioners became interested in participating in the program. It offered petitioners some money and a chance to get master's degrees. Roger met with an affiliated professor stationed in the Minot area who explained the program to him.Petitioners then submitted their applications for admission to the program to the New School. Roger was required to state in his application that he would be willing to teach in the public school system. The application contained no reference as to the location of such a teaching position. At that time, Judy was teaching in Minot at a salary of $7,300 a year. While petitioners had some qualms about the possibility of being assigned to different locations, or even away from Minot where they owned a home, they found out that the University officials tried to place the program's participants, known as interns, where they formerly came from. After petitioners were accepted in the program, and prior to entering into a teaching contract with the Minot School District, they spoke with the superintendent of the school district and other supervisory officials about *77 returning to Minot to teach. Neither petitioner discussed this topic with any administrative official prior to their acceptance by the New School. After her acceptance, Judy specifically discussed with the principal the question of whether she would return to Longfellow to teach second grade. The principal discussed the question with the superintendent and she did return. On June 15, 1970, each petitioner signed a contract with the Minot School District and the New School which stated in part as follows: 1. Said TEACHER will be considered by the SCHOOL DISTRICT to be on leave without pay for the period of training and will not sacrifice rank or seniority upon his/her return. 2. Said TEACHER will receive an annual monetary compensation in the amount of $4,800 * from the New School of Behavioral Studies, to be paid equally in 15 installments, and the remission of registration fees and tuition, so long as satisfactory academic progress is maintained. 3. Said TEACHER agrees to return to Minot *78 School District for a period of time equal to or longer than the amount of time spent in the New School of Behavioral Studies. 4. Said TEACHER upon return will participate in the DISTRICT salary schedule at the appropriate level of training and experience, as defined for the specific levels then attained by the TEACHER. * * *
6. SCHOOL DISTRICT, in lieu of salary for the above TEACHER, will pay $6,084 [1] (in three installments -- October 15, December 15, and February 15), annually, directly to the University Accounting Division, toward the establishment of a New School-Local District Fellowship and Program Support Fund. [Footnote added] Petitioners moved to the Grand Forks Campus of the University of North Dakota about June 15, 1970. In addition to the amounts received by petitioners as allowances for their two children, they were to receive $320 a month each for 15 months while participating in the program. However, when they arrived at the University they were informed *79 that the program had received less money from the Federal government than expected and that they would each only receive $300. Those who could not afford to remain in the program at the reduced rate were released. The New School and the stipend received by the petitioners were the products of a plan developed jointly by the North Dakota Department of Public Instruction, the North Dakota Legislative Committee and the University of North Dakota, pursuant to a state-wisde study of education conducted by the same agencies. Prior to 1967, North Dakota dissipated its expenditures for public education and thereby failed to derive full benefit from its efforts due, in part, to an undue reliance upon underprepared--and therefore, partly unqualified--personnel. North Dakota ranked 50th among the states in the matter of professional preparation of its elementary school teachers, and in overall opportunities for elementary education. In that year, the average salary for a qualified full-time teacher was said to be $6,000. In 1967, the majority of elementary school teachers in the State of North Dakota were not qualified. Moreover, their average salaries were far less than $6,600, the proposed *80 average salary under the new foundation program. In 1965 and 1966, in fact, the average salary paid was approximately $4,500. Thus, the actual average was roughly only 2/3 of the proposed average salary for qualified teachers. No significant improvement in elementary education could be realized in North Dakota until qualified teachers were employed in all elementary classrooms. It was the desire of many educational leaders in North Dakota to increase the level of education of teachers prior to conducting classes. In order to place qualified educational personnel in every reorganized school district in the State of North Dakota, the state colleges and universities needed to take appropriate initiatives to prepare 1,950 teachers (at M.A. level) in the state's elementary schools by 1975. As part of the state-wide plan for educational improvement, the state colleges and universities were asked to assume primary responsibility to prepare more effective elementary teachers and other needed professional personnel; local districts were asked to agree to employ and retain them. Salary levels for teachers and related qualified personnel were to be adjusted upward. The University of North *81 Dakota was much involved in instituting a program toward this end. A part of the plan for educational improvement was for the University of North Dakota (University) to develop and initiate experimentally a new graduate program for elementary teachers that emphasized the clinical aspects of teaching. Within cooperating district schools, the University was to assign an instructional team, provide resident clinical experience for each team, and incorporate that clinical experience into an appropriate master's degree program; thereby inducing prospective college graduates to accept assignment as members of instructional teams in locations served principally by non-degree teachers. It was also suggested that the University assign a qualified clinical professor to each regional service center established by the Department of Public Instruction. These professors were to supervise the clinical practice of the instructional teams in the center's region, and were to consult with cooperating districts on problems of instructional innovation and improvement. It was also suggested that the University create an autonomous new school of behavioral science within the University to develop and *82 conduct the experimental program. The New School program resembles this plan. The New School was established as an experimental entity within the University and, as such, was expected to contribute greatly to public elementary education in North Dakota. Creation of the New School was the first step in a comprehensive program for the development, redevelopment and placement of professional personnel for service in elementary education in North Dakota. The New School launched a manysided project designed to offer a new style of professional development, incorporating study and extensive internships, and to create a fully prepared cadre of elementary school teachers with master's degrees. The New School program was set up by the University in two parts. One was to obtain advanced degrees - the master's or doctor's of education degrees. The school district participated in that portion of the program. The second was to upgrade the teaching abilities and degrees of teachers and was aimed at assisting them to return to school to obtain the bachelor's degree. The New School offered teachers an opportunity to do research during the summer at the University, apply that research *83 in the following school year in a classroom setting, and then return to the University the next summer and analyze the techniques and procedures they had tried in a classroom. There are certain state standards to be met in classrooms in North Dakota. The University knew those well, as did the local school districts, and those standards were adhered to.Certain skills that should be taught in reading, or in math, were planned for in the techniques used by the intern-teachers. The clinical professor assigned to the Minot Regional area by the New School was Dr. Gale Teske. Dr. Teske was responsible for overseeing that the requirements of the school district were being met, and upheld the University's responsibility for proper instruction. The nature of Dr. Teske's duties was to be in school working at some kind of educational project and showing the teachers how it was done, or supervising teachers who were doing it. Dr. Teske had first-line responsibility and communicated frequently with the principal and members of the school district in regard to the development of the program. Dr. Teske had close supervision of the petitioners. During the years 1970 and 1971, the University *84 offered more than one option which led to the acquisition of a master's degree. One of the options was the New School program. Classroom teaching was required in order to obtain a master's degree under the New School program; but it was not necessary for petitioners to teach at Minot. It was also possible to get a master's degree directly from the University. Funds for the program came from three sources: the State of North Dakota; the school districts where the interns taught; and the Federal government through H.E.W. by obtaining enough money from the first two sources to meet the funding requirements of H.E.W. Local school districts in North Dakota are relatively autonomous and bear the responsibility to determine and provide appropriate programs for their pupils. Local school districts through their school boards and professional staffs retain--under policies established by the State legislature--full responsibility for curriculum and for instructional services. However, the North Dakota Department of Public Instruction tells the school districts what subjects should be taught in the grade schools in North Dakota. The school district agreed with officials of the University *85 that it would be willing to participate in the New School internship program. Part of the decision to participate was based on the fact that certain classrooms would be provided with intern-teachers, that these interns would be carefully supervised by a clinical professor, and that the University would accept responsibility for selecting and developing certain kinds of teaching techniques which would be useful, not only to the teacher, but to the district. The school district was also interested in seeing some research done in the area of education. Another motivation may have been the fact that the school district's subsidy from the State Board of Education increases with the educational level of its teachers. The school district was very concerned about the procedures that might be used in selecting teachers for the program. It was determined that no teachers with less than a bachelor's degree would be permitted the privilege of entering the program. Also, the school district was not interested in getting involved with other teachers from other school districts although they did accept one intern from another state with the understanding that the intern might stay in the district *86 or ask to be released. The school district obtained a commitment from the New School that only teachers on leave from Minot would be sent to that school district for their internships. The school district had a responsibility to the University to compensate the New School as part of the internship program. The money was not specifically stated as an amount to be given to an individual teacher, but was rather an amount that was given to the University for the program and to be expended by the University. When the school district paid the New School a specified amount, the district was guaranteed that it would get an internteacher for a classroom assignment. The school district was assured of this when it signed the contract with the teacher and the University. As a result, the school district did not have to hire a regular teacher for that classroom. The school district did not pay the New School the same amount for every intern. The amount varied. The amount the district was to pay was a percentage of the salary that the teacher would have received had he or she remained in the district. The school district did not write paychecks to the intern-teachers. It did not pay any amount *87 to the intern-teacher. Petitioners received their compensation from the University and no moneys were withheld by or on behalf of the school district for any purpose, e.g., insurance, whatsoever. Although the State of North Dakota has a compulsory retirement program for teachers, no contribution was made for that purpose by the Minot School District for the period petitioners were interns in the New School program. In 1968-1969 there were 17 interns of the program in the Minot School District of which two did not return to that district after completion of the program. Up to 1976, about 30 teachers served internships in the Minot school system. Out of that total, five did not return to Minot after completion of the program. In 1970-1971 there were three interns including the petitioners, and one did not return to the school district after completing the program. Also, two interns withdrew from the program before its completion. One continued teaching in another school system in the state, the other did not continue teaching that year; they were not continued at Minot after leaving the program. No attempt was made to enforce the provisions of Paragraph 3 of the teacher's *88 contract against the interns who left the program or who did not return to Minot for the required period - time equal to the intership. They requested and were granted releases from their contracts by the School Board upon the recommendations of the administration. The reason three interns did not return to the Minot School District was because of their participation in a teacher walk-out, or strike, in 1969. They went to another school district to finish out their internship. Another individual not involved in the strike asked to be released from her contract because her husband found employment out of the district, or state, and she chose to go with him. At least two other people asked to be released to go to another location, one of whom did not finish the internship. There is no tenure for teachers in North Dakota. Sec. 15-47-27 of N. D. Century Code Annotated provides for annual renewal of teacher contracts. School districts must notify a teacher by April 15th whether the contract will be renewed for the following school year. Failure to do so extends the previous contract to the following year provided the teacher claims a renewal contract by May 1st. After accepting *89 the program the school district considered the need for continuing supervision of all classrooms and students in all classrooms, and as a result, the principal of each school took some responsibility for participating in classroom activities and for visiting the classrooms. The larger responsibility was that of the clinical professor. The school district assisted the University in providing announcements to the staff with regard to the opportunities the program provided. Three teachers from the Minot School District participated in the New School program during the school year 1970-1971. Petitioners were two of the three teachers. While at the University the first summer, petitioners attended classes in specific courses. However, the classes were different from the usual type in that students who had particular skills would act as assistants to the professors in working with less skilled students so that the teaching alternated between student and teacher. There were an average of 35 to 40 students in petitioners' classes. All were elementary school teachers. In content courses, e.g., elementary science, there were two professors; one dealt with content, the other, the clinical *90 professor, was concerned with new methods to be used in teaching the subject. Petitioners' research at the University consisted of developing presentation of subject matter that would incorporate the content and create an atmosphere conducive to learning. They completed their classroom sessions at the University toward the end of August and returned to Minot. Roger returned to the Minot School District to teach 22 students in the sixth grade at Roosevelt Elementary School. The State of North Dakota and the district determined which courses were taught in the sixth grade at Roosevelt School during the year 1970-1971. Roger worked under Dr. Teske, a clinical professor from the University, who observed all the interns twice a week. Roger submitted lesson plans to Dr. Teske who would give the plans to the principal of Roosevelt School. Roger was directly responsible to Dr. Teske for his lesson plans. Dr. Teske would usually come to the Roosevelt School every Friday or Monday to evaluate the plans, and to insure that Roger was within his outlined plan of work. The school district had a long standing requirement that teachers have lesson plans available on Friday so they would *91 be available for at least the first three days of the following week. The purpose of lesson plans is to help the teacher to formulate his goals and objectives for the coming week; to allow a substitute for an absent teacher to proceed with the work planned for that period; and to measure the progress of students. This requirement was no different for the intern-teacher, although the procedure was a bit different because Dr. Teske got involved in the process and had an opportunity to review and approve the activities. It was the responsibility of Dr. Teske as overseer and University representative, to ensure that the State's standards as to course content were being met by the interns. The principal of Roosevelt School met with Dr. Teske and they discussed Roger's lesson plans. Although the principal had some responsibility to supervise interns such as petitioner, the larger responsibility was that of the clinical professor, Dr. Teske. He closely supervised petitioner and kept in close communication with the principal, and frequently with the district superintendent with regard to the activities in the program. Most of the discussion related to development of the program rather *92 than supervision of the petitioners or other interns. Roger's program for teaching included bringing to the classroom a variety of adults who had various skills which could be related to basic skills required of the pupils -- language skills, mathematics skills, communication skills, and science and health skills. For example, he had people engaged in the field of communication -- a writer of television commercials, newspaper columnists, a sports announcer, and authors; others who participated were as diverse as a hairdresser, science professor, home economist, a kidney transplant patient, and musicians. The planning for the programs in which these people participated took place both at Grand Forks and at Minot prior to the beginning of the term. Roger used videotape recordings of many of these participants in the classroom setting. He has about 40 hours recorded on videotape. The pupils used tape recorders to get information from the participants. The videotape recorded the effectiveness of the use of career people in a classroom. If Roger had not taught the 22 students at Roosevelt School during 1970-1971, some other teacher would have taught them. During the school year *93 1970-1971, Roger did not contribute to the teacher retirement program of the State of North Dakota. Judy returned to the Minot School District to teach in the second grade at Longfellow Elementary School during the year 1970-1971. She had about 24 students in an open classroom setting, all there with parental consent. She applied the skills which she learned during her training and study at the University through new methods of teaching reading, secure in the knowledge that she had successfully taught reading at a second grade level in the previous year. She introduced puppetry, choral readings, creative writing, and music, to bring out basic skills in reading. She also established learning centers in the classroom, i.e., centers for math and math games; reading and reading games. Judy used skills in her classroom teaching which were subsequently combined with portions of the videotape and constituted an exhibit attached to petitioners' joint master's thesis. Judy also used young authors in teaching writing in her class. Judy was accountable to Dr. Teske for lesson plans and what she was doing. She worked evenings and weekends, in addition to the normal classroom teaching *94 preparation, in preparation of memoranda in support of the particular method to be used to demonstrate the goals which would be obtained through the use of the method. [2] These memoranda were submitted to Dr. Teske and if he approved, Judy would then go to the principal and explain what was being done. Dr. Teske assisted Judy and had supervisory responsibility over her. He visited her classroom about two days a week and would be in the classroom from 15 minutes to an hour and a half. Dr. Teske coordinated Judy's teaching activities with the principal at Longfellow School. The principal also observed Judy while she was teaching. The Minot School District had control over what subjects were taught by Judy at Longfellow School, and the University supervised how they were taught. Judy was accountable for so many minutes of reading and math and so forth. One of the responsibilities of the principal at Longfellow School was to know the activities of Judy's class.She was accountable to the principal in what she was doing so that *95 he would be able to communicate with the parents of her students. If Judy had not taught those 24 students during the school year 1970-1971, another teacher would have taught them. During that year she made no contribution to the State's teacher retirement program. Petitioners returned to the University campus at least six times during the school year. While on the campus they met with their professors and interns from around the State and would go over particular programs or acquire some additional skills, information, research in the area of language arts, or math methods or science techniques. They spent about 85% - 95% of their school time in their classes. They also visited other schools as observers of other interns enrolled in the New School program.When petitioners were absent from a class on such occasions, their places were taken by professors from the New School, or the principal or a hired substitute. The substitute teachers were retained by the University and not the school district. The principals of Roosevelt School and Longfellow School were retained by the school district. A visiting professor would frequently take over a class even while petitioners were *96 present in order to evaluate the techniques petitioners were using. Petitioners, in their classrooms, used a different grading system than that used in other classes in the schools. Instead of using simple letter grades, their report card listed all the skills and was the basis for a parent-teacher conference at each grading period. This was the system required by the New School. On or about June 15, 1971, after the conclusion of the school year, petitioners and their family returned to the University of North Dakota.Petitioners had worked on their joint thesis during the school year and had it typed about March. However, when they reviewed the videotapes and films used in their classes, they decided to incorporate selected portions of those as part of the thesis. This part was done upon their return to the University for their second summer. They were at the University from about the middle of June until the middle of August, when they received their master's degrees. Half hour segments of petitioners' videotapes incorporated into their thesis were distributed throughout the State on a library basis and used by other teachers as possible models for teaching techniques. *97 After obtaining his master's degree, Roger signed a teaching contract with the Minot School District and taught the sixth grade in Roosevelt School in the same classroom he had taught in during 1970-1971. Roger has been teaching at the Roosevelt School since that time. After he received his master's degree, his annual salary was about $8,000. After obtaining her master's degree, Judy returned to Longfellow School as a second grade teacher. The teaching programs used by petitioners upon their return from Grand Forks were based on the knowledge gained through attendance at the New School. At the time of trial, Judy was a reading improvement teacher at North Hill Elementary School. In 1974, she was named outstanding young educator of her school district and of the State of North Dakota. Judy also placed third in a region-wide selection as an outstanding young educator.During that year, she was chosen as one of the top 200 elementary school teachers in the United States. In 1971, the New School paid petitioners approximately $600 per month from January through August, plus approximately $1,500 for the support of their two children. Respondent determined that the total amount *98 received was $6,360 and that it was income. There is no dispute as to the amount received. Petitioners claim that the moneys paid them qualify under section 117(a) as fellowship payments received as part of their advanced study program at the University and are excludable from their income. OPINION Code section 117(a)(1) provides for the exclusion from gross income of any amount received "as a fellowship grant", subject to the limitations contained in section 117(b). The word "fellowship" is not defined in the statute, but section 1.117-3(c), Income Tax Regs., provides: A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. * * * Section 117(b)(1) provides that in the case of degree candidates the exclusion from gross income does not apply to payments for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or fellowship grant. An exception is carved out of the rule in section 117(b)(1) where the teaching, research or other services are required of all degree candidates. Before reaching the issue presented *99 by section 117(b), we must determine whether the moneys in question have the normal characteristics associated with the term "fellowship." Reese v. Commissioner,45 T.C. 407, 413 (1966), aff'd. percuriam,373 F. 2d 742 (4th Cir. 1967). Section 1.117-4(c), Income Tax Regs., provides that the exclusion shall not apply to payments which represent compensation for past, present or future services or for services which are subject to the direction or supervision of the grantor, and payments made to an individual to enable him or her to pursue studies primarily for the benefit of the grantor. It is further provided that if the amounts received are for the primary purpose of furthering the education and training of the recipient in his individual capacity, they are excludable even though there may be an incidental benefit to the grantor. In Bingler v. Johnson,394 U.S. 741, 751 (1969), the Supreme Court upheld the validity of this regulation. The primary purpose of the grantor in making the payments determines whether they represent a fellowship to enable petitioner to further his education or compensation to petitioner for his services. *100 Bailey v. Commissioner,60 T.C. 447, 451 (1973). Payments qualifying as fellowships must be "relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quidproquo from the recipients." Bingler v. Johnson, supra, at 751. First, we must determine who is the grantor, the school district or the State of North Dakota through its State University. Petitioners' "Teachers [Contracts]" were with the school district, not the University. A withdrawal from the program required the approval of the school district and not the University.Although the University paid the petitioners, it was with money obtained from the school district specifically for that purpose. Before the school district made the funds available, it obtained a commitment that the funds were "in lieu of salary for" the petitioners. The University was merely a conduit for the school district's funds. We find that the school district was the grantor of the funds. Now, we must determine the primary purpose of the school district in making the payments to the petitioners. Steiman v. Commissioner,56 T.C. 1350 (971). *101 The decision in each case turns on the particular facts and circumstances of that case. Zolnay v. Commissioner,49 T.C. 389 (1968). The school district obtained a commitment from the New School to pay a portion of the funds received by the New School from the school district to the petitioners before the school district made the funds available. The amount paid by the school district to the New School was based on the salaries petitioners would have been paid as regular teachers. The difference between the amount paid by the school district to the New School, and the lesser amount paid by the New School to the petitioners, was used by the New School to cover the extraordinary costs of the program not covered by tuition. The amount of money received by each petitioner was not based on need, although an additional payment of $1,500 was made as a dependency allowance.In exchange for these payments, petitioners agreed to teach on a full-time basis in the Minot School District during the 1970-1971 academic year. It is the responsibility of the school district to provide an education for the children within the district. The primary means of educating these children *102 was the instruction rendered by teachers. Each petitioner herein made a valuable contribution to the performance of the district's responsibility. The contribution was not an "incidental benefit" to the grantor-district. If it had not been for the services performed by petitioners during the school year, the school district would have been compelled to hire other fulltime teachers. Petitioners performed as regular teachers subject to steady supervision to insure that they were meeting the State's requirements and the goals of the New School's program. The school district also received the benefit of the petitioners' research and any teaching techniques developed by the program. These benefits cannot be deemed insignificant in light of the availability to the school district of the film library consisting of half hour clips of the petitioners at work. This film library was distributed widely throughout the State. On completion of their tenure with the New School, petitioners were obligated to return to the school district "for a period of time equal to or longer than the amount of time spent in the New School." "The inference is clear that the program was adopted by the [grantor] *103 to train its employees so that they would perform their duties more effectively." Ussery v. United States,296 F. 2d 582, 586 (1961); see also, Haley v. Commissioner,54 T.C. 642, 646 (1970). Petitioners' contention that their agreements with the school district lacked mutuality of obligation because the school district did not agree to rehire them, overlooks the fact that they never ceased to be employees of the school district. They were on leave of absence for the period of training without loss of rank or seniority upon return after the conclusion of the leave of absence. While it is true that Roger was not employed by the school district prior to June 15, 1970, we hold that he became so employed on that date, and concurrent with that employment was placed upon leave "for the period of training." Petitioners' further contention that there was no binding obligation requiring them to return to the school district is wholly without merit. The few teachers who did not return upon completion of their studies at the New School obtained releases from the school district. Even in the absence of a binding obligation to return, the grantor's clear expectation *104 that the training program will lead to future employment may be sufficient to establish that the payments are compensatory. Smith v. Commissioner,60 T.C. 279, 285 (1973). The educational leave grants received by the petitioners in 1971 were bargained for payments given by the Minot School District primarily as compensation in return for present or future services rendered, or to be rendered, by the on behalf of the school district. Such payments are not fellowship grants within the meaning of section 117. * * *
In accordance with the foregoing, Decision will be entered for the respondent. Footnotes
*. In the form of Fellowships: Summer 1970, $600; Academic Year, 1970-1971, $3,500; Summer 1971, and $500 per dependent during the academic year and second summer session.↩
1. The school district paid $6,084 for Roger and $6,552 for Judy. The amount is a fixed percentage of what the interns would be paid as regular teachers based on their training and experience.↩
2. Both petitioners also attended evening seminars conducted periodically by Dr. Teske at which other interns and school board members participated.↩